**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | |
|---|---|
| In re: | ) Chapter 7 |
| | ) |
| MICHAEL S. GOLDBERG, LLC | ) Case No. 09-23370 (ASD) |
| MICHAEL S. GOLDBERG | )          09-23371 (ASD) |
| | ) |
| Debtors. | ) Jointly Administered Under |
| | ) Case No. 09-23370 |
| | ) |
| JAMES BERMAN, CHAPTER 7 TRUSTEE FOR THE ESTATES OF | ) |
| MICHAEL S. GOLDBERG, LLC, and MICHAEL S. GOLDBERG | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| R. STEIN & CO., L.P.; CARL BINDMAN; PETER P. CARBONE; BARRY | ) |
| GORSUN; ROBERT KLEIN; JAY MARMER; GARY SLAYTON; LEWIS | ) |
| SLAYTON; ELAINE STEIN, Individually, and as Successor Trustee of the | ) |
| PAUL SLAYTON TRUST AGREEMENT DATED FEBRUARY 19, 2002, | ) |
| and as Trustee of the ELAINE STEIN 1992 REVOCABLE TRUST; JEFFREY | ) |
| STEIN; MICHAEL STEIN; and ROBERT STEIN, Individually, as General | ) |
| Partner of R. STEIN & CO., L.P., and as Trustee of the ROBERT STEIN 1992 | ) |
| REVOCABLE TRUST; | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | |

## **COMPLAINT**

Plaintiff, James Berman, Chapter 7 Trustee (the "Trustee") for debtors Michael S.

Goldberg, LLC, d/b/a/ Acquisitions Unlimited Group (the "Debtor, LLC") and

Michael S. Goldberg ("Goldberg"), which are sometimes, collectively, referred to hereinafter as the "Debtor" or "Debtors", alleges as follows:

## SUMMARY OF THIS PROCEEDING

This action seeks to recover over $1 million of preferentially and fraudulently transferred cash paid to the defendants prior to the collapse of the Goldberg Scheme (as hereinafter defined). The Debtors' transfers to the defendants in 2007, 2008 and 2009 were funded with cash fraudulently obtained from other investors in what was a pure Ponzi scheme with no legitimate business activity. The Trustee seeks to recover these transfers of returned "capital" and "profit" from R. Stein & Co., L.P. (hereinafter sometimes referred to as the "Stein, L.P."), its general partner, Robert Stein, and its limited partners; and additionally to recover other payments made by the Debtors to certain defendants who also invested directly in the Goldberg Scheme in addition to their investments through Stein L.P., and who received avoidable transfers on account of those investments.

Robert Stein began investing in the Goldberg Scheme in late 2006. While he began as a typical investor, he broadened his relationship with Goldberg over the next three years to maximize his already exorbitant returns. To that end, he became one of the most aggressive and successful feeders to the Goldberg Scheme, creating several special purpose vehicles to bring in new investors, often earning significant fees and commissions on top of the outlandish returns on his own investments.

In 2007, Robert Stein organized one of his first special purpose vehicles, Stein, L.P., to provide a means for him, and investors solicited by him, to invest in the Goldberg Scheme. Stein L.P. had no other purpose. Potential limited partners were enticed to join by promises of 80% to 120% compounded, annualized returns with purportedly no risk to their capital.

Though Robert Stein held an advanced degree in business and had a lifetime of corporate experience at the executive level, he accepted little more than Goldberg's self-serving description of his fantastical business as sufficient due diligence to begin investing large sums of his and other people's money. Despite the patently incredible operation Goldberg described to him at the outset of their relationship, Robert Stein attracted numerous investors who collectively poured millions of dollars into the Goldberg Scheme.

Following his creation of Stein, L.P. and notwithstanding his growing suspicions about Goldberg's honesty and the legitimacy of his deals, Robert Stein established two additional single purpose vehicles (the "AUG LLCs") to bring even more cash into the Goldberg Scheme. Several of the Stein, L.P. limited partners also participated in the AUG LLC deals with Goldberg. Through the AUG LLCs, Robert Stein was able to further enrich himself, mostly with fees and commissions earned on other people's money, and he provided Goldberg with a steady source of additional funds needed to

keep the scheme from collapsing, while taking on relatively little additional personal exposure.[1]

Throughout his business relationship with Goldberg, Robert Stein consistently chose to avoid pursuing answers to the most basic questions when faced with obvious red flags. Instead, he persisted in willful blindness and did what he could to keep the money flowing until the patent absurdity of Goldberg's claims was too extreme for even Robert Stein to ignore. At that critical juncture, he sought to extract as much money as possible for himself and his investors without prematurely driving Goldberg into hiding, bankruptcy or jail. He succeeded in extracting a substantial final round of transfers from the Debtors in August 2009, including $10 million in connection with the AUG LLCs, $192,000 for Stein, L.P., and an additional $100,000 for himself.

### Jurisdiction, Venue and Nature of this Proceeding

1.     On November 18, 2009 (the "Petition Date"), certain petitioning creditors filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against the Debtors.

2.     On November 24, 2009, the Court entered the Order for Relief in the Debtors' cases.

---

[1]  The capital, "profit", fees and commissions received by Robert Stein and others as part of the AUG LLC deals are not the subject of this Complaint. They are addressed in a previously-filed action, Berman v. Cohen, et al., 11-02013 (ASD), concerning the AUG LLC deals.

3.      By Orders dated January 11, 2010, the Court confirmed the election of James Berman as Chapter 7 Trustee in both cases.

4.      On February 26, 2010, this Court entered an order consolidating these cases for joint administration only.

5.      This Complaint initiates an adversary proceeding pursuant to §§ 541, 544, 546, 547, 548, 550 and 551 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 7001(1).  This Complaint seeks (1) to avoid and recover for the benefit of the estates preferential transfers of the Debtors' property made to or for the benefit of Robert Stein on or within 90 days of the Petition Date; and (2) to avoid and recover fraudulent transfers of the Debtors' property made to or for the benefit of the defendants.

6.      This Court has jurisdiction, under 28 U.S.C. §§ 157 and 1334(b), over the subject matter of this proceeding because the claims asserted herein arise under Chapter 7 of the Bankruptcy Code and are related to a case pending under the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut, Hartford Division (the "Bankruptcy Court").

7.      This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (E), (F), (H) and (O).

8.     Venue of this adversary proceeding in the Bankruptcy Court is proper pursuant to 28 U.S.C. § 1409(a) because the Debtors' cases are pending in this district and division.

## **FACTUAL BACKGROUND OF THE GOLDBERG SCHEME**

9.     The more than $1 million of preferential and fraudulent transfers to the defendants the Trustee seeks to recover in this action were transferred to them in furtherance of a classic and pure Ponzi Scheme which was conducted over the last 12 years by Goldberg and the Debtor, LLC (the "Goldberg Scheme").[2]

10.    The Goldberg Scheme promised (and, for a long time, paid) patently unbelievable rates of return of up to (and in some instances exceeding) twenty percent (20%) per quarter (when compounded over 100% annually), in purportedly *risk-free* investments.

---

[2]  A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi. Cunningham v. Brown, 265 U.S. 1 (1924). In such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme.  See Bear Stearns Servs. Corp. v. Gredd, 397 B.R. 1, 8-10 (S.D.N.Y. 2007) (citing Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n.3 (2d Cir. 1995)); see also In re: Unified Commercial Capital Inc., 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ("A Ponzi scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly-attracted investments.  Typically, investors are promised larger returns for their investments.  Initial investors are actually paid the promised returns, which attracts additional investors."). There is a general rule - known as the "Ponzi scheme presumption" - that such a scheme demonstrates fraudulent intent as matter of law because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." Gredd, 387 B.R. at 8-10; see e.g., Donnell v. Kowell, 533 F.2d 462, 770 (9th Cir. 2008); Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006); SEC v. Resource Dev. Int'l, LLC, 487 F.3d 295, 304 (5th Cir. 2007); Armstrong v. Collins, 2010 U.S. Dist. LEXIS 28075, at *63 (S.D.N.Y. 2010).

11.     Goldberg represented to investors that he and/or the Debtor LLC were engaged in primarily two types of business deals that generated these fantastic returns. First, in the early years of the Goldberg Scheme (but continuing throughout), Goldberg represented that he could purchase diamonds at extremely low wholesale prices on the New York City diamond exchange and resell those diamonds for a profit sufficient to pay investors in these diamond liquidation contracts, a twenty percent (20%) rate of return every sixty (60) days (the "Diamond Deals").

12.     The second and more recent set of deals were based on Goldberg's representations to potential investors that he was one of a handful of "preferred vendors" of "Chase Manhattan Bank" which tellingly has been publicly known as JP Morgan Chase, N.A. ("Chase") since 2000.  Goldberg represented that he had a contractual right to purchase foreclosed business assets (such as structural steel, aluminum and other construction material) from a "Chase Foreclosure Manifest" at prices low enough to allow him to re-sell those assets (usually within ninety (90) days of purchase) to large institutions at profit margins of up to one hundred percent (100%) (the "Chase Asset Deals").  Goldberg told investors that his relationship with Chase was governed by a 1999 contract between the Debtor LLC and Chase that had been updated from time-to-time (the "Chase Master Agreement").

13.     Goldberg represented to investors that the Chase Asset Deals involved pre-arranged sales to major public companies such as Ford, United Technologies

Corporation ("UTC"), Bechtel Corporation ("Bechtel"), Bausch and Lomb, Swinerton

Builders ("Swinerton") and others.

14.     Goldberg also made the fantastical representation to investors that the

Chase Asset Deals were "risk-free" because the purported Chase Master Agreement

contained a "Contract Dissolution Capital Protection Clause" which obligated Chase to

repurchase the foreclosed business assets for the full amount of the purchase price if the

Debtor was unable to re-sell the acquired assets to the expected ultimate buyer for any

reason.

15.     In stark contrast to the more complex fraudulent schemes utilized in many

high-profile Ponzi schemes such as those perpetrated by Bernard Madoff, Scott

Rothstein, Mark Dreier and the Bayou Fund, the Goldberg Scheme did not involve any

legitimate or actual business or investment activity by the Debtors.  All the funds used to

pay investors came from other investors.

16.     There was no reasonable basis for investors, including the defendants, to

believe Goldberg's returns were legitimate or his representations were truthful.  First

and foremost, the returns, themselves, on any basis, let alone a risk-free one, were

patently incredible.   In addition, Goldberg was not, and had never been, a licensed

investment advisor, had no financial training and was employed, on a full-time basis, as

a medical device sales representative.  Moreover, the documents utilized by Goldberg in

his "deals" are replete with typos, ambiguous language, erroneous information and

other, additional  "red flags" that should have put even the most unsophisticated investors on notice that they might be dealing with a con artist. The fact that Goldberg appeared to be able to generate a seemingly limitless number of Diamond Deals **and** Chase Asset Deals (deals that strain credulity in isolation and which taken together appear totally ludicrous) also should have alerted the defendants to the fraudulent nature of the Goldberg Scheme.

17.    The Debtors' Diamond Deals and Chase Asset Deals were a complete sham.  The Debtors never bought diamonds or foreclosed assets with investor funds and never sold anything to the purported third-party "buyers."  No "profits" or other income or proceeds were generated by any transactions involving the Debtors.  All of the funds received by investors went to either pay off other investors or for Goldberg's personal use or benefit.

18.    As word of these fantastic returns on virtually risk-free investments spread, increasing numbers of investors wanted "in" on the Goldberg Scheme.  More significantly, the Debtors, knowingly and unknowingly, began compensating individuals and companies who brought investors to the Goldberg Scheme in return for a percentage of the investment dollars they generated ("Feeders").

19.    The increased investment activity in the Goldberg Scheme (between the early 2000s and 2007) was due, in part, to the Feeders' strong incentive to bring larger and larger deals to Goldberg.  The Feeders were risking other people's money while

9

"earning" a 2% to 5% participation rate *plus*, in some instances, a finder's fee of up to ten percent (10%) on the investments made by their clients. The increased investments generated by the Feeders caused the size of the Goldberg Scheme to explode between 2007 and 2009 to involve over a hundred and thirty million dollars in transactions and resulted in over a hundred investors holding the bag for over $30 million in losses.

20.     In mid to late 2009, more and more large investors began demanding full payment on the due dates of their contracts, instead of "rolling them over." At this point, the Goldberg Scheme became increasingly difficult to maintain. Goldberg began making later and later payments while he tried to find replacement investors to pay off those investors who were demanding money. These late payments created additional concerns among large investors who, for all the reasons stated above, feared the worst in terms of Goldberg's <u>bona fides</u>. Accordingly, these large investors put Goldberg under increasing pressure.

21.     In the fall of 2009, Goldberg was sued and his assets were frozen by a group of large investors whose recently invested millions had not been returned when due. At this point, Goldberg turned himself in to federal authorities.

22.     On or about November 16, 2009, Goldberg admitted to federal law enforcement officials that his sole source of payment to investors was with the funds obtained from other investors. On September 13, 2010, Goldberg entered a plea of guilty to federal wire fraud charges in connection with his operation of the Goldberg

Scheme pursuant to the Plea Agreement attached hereto as **Exhibit A**.  In the Plea Agreement, Goldberg admitted:

> In fact, and as the defendant well knew, each and every one of the defendant's representations were false:  aside from during the first six months of his scheme, the defendant did not purchase diamonds in New York City or any other location; the defendant did not have any relationship, contractual or otherwise, with Chase; the defendant did not purchase any foreclosed and seized assets from Chase, nor did he resell any foreclosed and seized assets.  In truth and in fact, the defendant paid the promised returns to existing investors with funds he received from new investors or reinvested funds.

23.     On May 16, 2011, the Honorable Robert N. Chatigny, United States District Judge for the District of Connecticut, sentenced Goldberg to a term of imprisonment of 120 months and imposed an order of restitution in the amount of $31,023,035.40.  Copies of the Judgment and Order of Restitution are attached hereto as **Exhibits B** and **C,** respectively.

## Parties

24.     The Trustee is the duly appointed Chapter 7 Trustee for the Debtors and has standing both as Trustee and as assignee of all claims against the Debtors formerly owned by certain creditors.

25.     Defendant, R. Stein & Co., L.P., is a Massachusetts limited partnership with its principal place of business in Singer Island, Florida.

26.     Defendant, Carl Bindman, is an individual who is domiciled in Andover, Massachusetts.

27.     Defendant, Peter P. Carbone, is an individual who is domiciled in Singer Island, Florida.

28.     Defendant, Barry Gorsun, is an individual who is domiciled in Mason, Ohio.

29.     Defendant, Robert Klein, is an individual who is domiciled in Willsboro, New York.

30.     Defendant, Jay Marmer, is an individual who is domiciled in Palm Beach Gardens, Florida.

31.     Defendant, Gary Slayton, is an individual who is domiciled in Chicopee, Massachusetts.

32.     Defendant, Lewis Slayton, is an individual who is domiciled in Stamford, Connecticut.

33.     Defendant, Elaine Stein, is an individual who is domiciled in Singer Island, Florida.

34.    Defendant, Elaine Stein, Successor Trustee of the Paul Slayton Trust Agreement Dated February 19, 2002, a Florida trust, is domiciled in Singer Island, Florida.[3]

35.    Defendant, Elaine Stein, Trustee of the Elaine Stein 1992 Revocable Trust, a Florida trust, is domiciled in Singer Island, Florida.

36.    Defendant, Jeffrey Stein, is an individual who is domiciled in Haverhill, Massachusetts.

37.    Defendant, Michael Stein, is an individual who is domiciled in Bethesda, Maryland.

38.    Defendant, Robert Stein, is an individual who is domiciled in Singer Island, Florida.

39.    Defendant Robert Stein, General Partner of Stein L.P., is domiciled in Singer Island, Florida.

40.    Defendant, Robert Stein, Trustee of the Robert Stein 1992 Revocable Trust, a Florida trust, is domiciled in Singer Island, Florida.

---

[3]   Upon information and belief, Paul Slayton, who died on or about April 10, 2009, was the transferee of a portion of the funds received by the Paul Slayton Trust Agreement Dated April 19, 2002 from the Goldberg Scheme.  On or before his death, Paul Slayton transferred all or substantially all of his property to the Paul Slayton Trust Agreement Dated April 19, 2002.  Because there were no assets in Paul Slayton's estate after his death, the Palm Beach County Probate Court did not appoint a Personal Representative to administer his estate.

## **FACTUAL BACKGROUND AS TO THE DEFENDANTS**

41.     Robert Stein has a Master's Degree in Business Administration and was formerly the Chief Financial Officer and Chief Executive Officer of a public company traded on the New York Stock Exchange.

42.     Robert Stein learned of Michael Goldberg through word-of-mouth and began investing with him in late 2006.

43.     In or about September 2007, Robert Stein formed Stein, L.P., making himself the General Partner.

44.     As General Partner of Stein, L.P., Robert Stein is personally responsible for all debts and liabilities of Stein, L.P.  See Mass. Ann. Laws ch. 109, § 24 (2011).

45.     Stein, L.P. was created solely to invest in the Goldberg Scheme and primarily invested in the Diamond Deals, although some investments were also made in the Chase Asset Deals.

46.     The defendants named in this Complaint, except Robert Stein and Stein, L.P., were limited partners in Stein, L.P. and are collectively referred to hereinafter as the "Stein Limited Partner Defendants."

47.     From September 2007 until the Goldberg Scheme collapsed, Stein, L.P. participated in more than a dozen Diamond Deals and Chase Asset Deals.

48.     Each Diamond Deal promised and, until the collapse of the Goldberg Scheme, paid a 20% return in exactly two months, which equals a compounded,

annualized return of over 120%. The Chase Asset Deals promised and delivered similarly exorbitant returns.

49.     Robert Stein brought several investors, including relatives Elaine Stein (wife), Michael Stein (son), Jeffrey Stein (son), Gary Slayton (brother-in-law) and Lewis Slayton (brother-in-law), into the Stein, L.P., principally to invest in the Diamond Deals, even though he:

- *never* saw any of the diamonds (or photographs thereof) that were the subject of the Diamond Deals in which Stein, L.P. participated;

- *never* knew the names of the sellers of the diamonds.

- *never* conducted any due diligence regarding North American Gold and Coin, the company listed in each Diamond Deal contract as responsible for the diamond certification process for each transaction;[4]

- *never* knew the method Goldberg used to transport the diamonds; and

- *never* saw a certificate of insurance for the diamonds or knew the terms of any applicable insurance coverage, or even the name of any carrier.

50.     Because the Goldberg Scheme bore the hallmarks of a classic Ponzi scheme, even investors and feeders making money from it could not ignore its obviously fraudulent appearance. **As early as September 2008**, the defendant Jay Marmer, a limited partner in the Stein, L.P. and a broker who helped Robert Stein find investors for the later and separate AUG LLC deals, expressed concerns to Robert Stein about the

---

[4] North American Gold and Coin was a name invented by Goldberg. The business never existed.

legitimacy of the Goldberg Scheme.    Marmer was concerned about some of the Goldberg "red flags" identified above.

51.    While discussing the Goldberg Scheme in September of 2008, Jay Marmer told Robert Stein about another Ponzi scheme which had recently been uncovered. Robert Stein responded by e-mail:

> I know there is a lot of this stuff out there.  Michael and Elaine Stein got snared by one from CA.  I know exactly how you feel and I do not blame you because I, too, felt the same way in the beginning.  Therefore, I strongly suggest and would personally feel better if you wait and see what Tom's [Ryan] due diligence uncovers and then decide if you want to invest more, stay pat [sic] or withdraw what you have already invested.  **I know it sounds like a scam and it may very well be, but I have been unable to ferret that out.**

(Ex. 78, emphasis added.)[5]

52.    In the same e-mail, Robert Stein told Jay Marmer:  "While I believe he [Goldberg] is straight, we do not now have a way to protect ourselves from him just walking off with the money, but he did not blink when we raised the subject of workable controls.  But, as both you and Tom [Ryan] have said, there are a lot of schemers out there."  This response was focused on potential cash controls for AUG LLC Chase Asset Deals that were eventually put in place in 2009.  These cash controls were not put in place to determine whether or not Goldberg was a fraud – but to protect Robert Stein

---

[5]  In a series of Rule 2004 examinations prior to the commencement of this case, the Trustee marked 126 exhibits, some of which are cited in this complaint by their original numbers.

and his investors (and no other investors) because Robert Stein suspected – correctly – that Goldberg was one.

53.    Faced with serious questions on the very existence of Goldberg's purported business in 2008 and 2009, Robert Stein consistently did what he could to keep the Debtors' return of "capital" and "profit" flowing, instead of doing what he could have easily done to uncover the truth of Goldberg's fraud.

54.    Stein, L.P.'s pattern of investment and withdrawal from the Goldberg Scheme demonstrates that, no later than June 2009, Robert Stein, because of rapidly mounting suspicions, began withdrawing Stein, L.P. funds from the Goldberg Scheme as part of an overall exit strategy ("Stein Exit Program").

55.    The Stein, L.P. last transferred money ($125,000) to the Debtors on or about February 5, 2009.

56.     From February 5, 2009 to August 17, 2009, Stein, L.P. received a total of $639,000 in transfers from the Debtors.

57.    Unlike many investors in the Goldberg Scheme, Stein, L.P. received 100% of its capital back plus substantial fictitious "profit."  Those funds were all stolen from other investors in the Goldberg Scheme.

58.    The Debtor's final four transfers to Stein, L.P. – on April 14, 2009, April 15, 2009, June 29, 2009 and August 17, 2009 – totaled $485,000.  This amount was "profit" to Stein, L.P., i.e., it exceeded any investments by Stein, L.P.

59.     It was not until well after the Stein Exit Program had been initiated that Robert Stein, in early July 2009, finally began to perform the kind of due diligence on the Goldberg Scheme that he could have and should have performed all along.

60.     On July 7, 2009, Robert Stein's attorney, Carl Santangelo, determined that e-mail addresses for "Julia Bates," a woman who impersonated a Chase employee (the "Chase Imposter"),[6] Swinerton, UTC and Bechtel were all phony and had all been established by the same individual, Angelo Scalise, a resident of Rocky Hill, Connecticut.  Also, on July 7, 2009, Attorney Santangelo performed a reverse telephone search on the phone number on the business card he had received from the Chase Imposter in New York a few weeks earlier and determined that the telephone number for "Julia Bates" was actually the telephone number of the Chase Imposter, Christine Woods, a woman living in the Bronx, New York.   On the same day that Attorney Santangelo discovered that the e-mail addresses Goldberg had given him were fraudulent, and that "Julia Bates" was an imposter, he sent copies of purported contract assignments to Swinerton, UTC/Hamilton and Bechtel, not by e-mail as required by Goldberg, but by Federal Express.

---

[6] On May 12, 2009, a meeting, arranged by Goldberg, took place at a Chase branch in New York. Goldberg introduced Carl Santangelo to a woman who introduced herself as "Julia Bates," a Chase employee.  "Julia Bates" was actually Christine Woods, a friend of Goldberg's who was not, and never had been, employed by Chase.

61.    One of these packages was sent to Brian Gleason at UTC/Hamilton because he was the purported signatory on Goldberg's contract with UTC/Hamilton and the person Goldberg had identified to Robert Stein and Attorney Santangelo as his contact.    After receiving Attorney Santangelo's notice of assignment of Goldberg's UTC/Hamilton contract, about which he knew nothing, on July 9, 2009, Brian Gleason called Attorney Santangelo and stated: "I am not a purchasing agent with Hamilton.  I do not make agreements for them."

62.    According to Brian Gleason's deposition testimony, Attorney Santangelo "just seemed very frustrated and concerned and just said, you know, so you don't make contracts for Hamilton and have not made a contract with them or with Goldberg?  I said yes."  As a result, by no later than July 9, 2009, Robert Stein and Attorney Santangelo knew with certainty that the Goldberg Scheme was a fraud.

63.    Robert Stein understood that an immediate and direct confrontation with Goldberg about his now confirmed suspicions would not help him secure the return of outstanding investments and more "profit" from the Debtors.

64.    Accordingly, Robert Stein and Attorney Santangelo engineered a plan to extract as much money as possible before the Goldberg Scheme collapsed.  This plan included:

- delaying any confrontation with Goldberg over the results of their investigative efforts about his purported business;

- pretending, in communications with Goldberg, that they continued to believe his business to be legitimate;

- not immediately attempting to withdraw all of Stein's and his investors' money from the Debtors; and

- introducing a hedge fund manager, Nelson Obus, to Goldberg and the Chase Imposter as a potential new and substantial investor.

65.     Because of the millions of dollars that Robert Stein and his investors had given to Goldberg through AUG LLCs Deals, Robert Stein knew, by no later than July 9, 2009, that the best way to extract money from the Debtors was to make Goldberg believe that he was about to bring Goldberg a significant new infusion of capital.  To that end, Robert Stein and Attorney Santangelo introduced Nelson Obus to Goldberg as part of their overall exit strategy.

66.     On August 4, 2009, Mr. Obus, Attorney Santangelo, Mr. Goldberg, and the Chase Imposter met at Chase to discuss the alleged interest of Obus' hedge fund in the Goldberg Scheme (the "Obus Meeting").

67.     Before the Obus Meeting, Attorney Santangelo informed Mr. Obus that he wanted him to evaluate the *bona fides* of Goldberg and the Goldberg Scheme.

68.     Shortly after the Obus Meeting, Mr. Obus informed Attorney Santangelo that he had no intention of investing in the Goldberg Scheme and that he was not sure that the Goldberg Scheme was a legitimate investment.

69.    In deposition testimony, Mr. Obus had this to say about the Obus Meeting

and the returns the defendants were getting from the Goldberg Scheme:

> Q.    And did either Mr. Santangelo or Mr. Goldberg ever
> tell you that he was paying, as part of the deal, a total
> amount of 12 percent per quarter?
> A.    Paying who?
> Q.    Paying the group – his group – the group of
> investors and brokers.
> A.    Oh, 12 percent a quarter?
> Q.    Yes.
> A.    That would be 50 percent annual.  That seems – I
> don't think those numbers were thrown my way.  I was
> concerned with the numbers he threw my way which were
> lower.
> Q.    Right.  If you had heard the 12 percent per quarter,
> what would your reaction have been?
> A.    I wouldn't have even gone.
> Q.    And the reason you would not have gone is
> because?
> A.    Nobody gets those returns.

70.    On August 12, 2009, a little more than a week after the Obus Meeting,

Attorney Santangelo sent an e-mail to Mr. Obus stating:

> if you are contacted by Michael Goldberg re your
> investment in Acquisitions Unlimited Group, I want you to
> know what we have told him.  We have said that we are
> working on a contract with your lawyers and are on track to
> fund the full $10M of your investment in the first week of
> September.  Let me know if Goldberg calls you.  He is due
> to pay off our current investment contracts early next week
> so he may want to double check that your money is coming
> in before he pays us.

(Obus Ex. 4)

71.     At least in part because of Robert Stein's and Attorney Santangelo's machinations, including the Obus Meeting, between August 20, 2009 and September 2, 2009, Goldberg transferred nearly $10 million into the Santangelo Trust Account, representing capital re-payment, fees and "profit" in connection with the AUG LLC deals.  As noted above, Stein, L.P. also received a transfer of $192,000 on August 17, 2009, and Robert Stein himself received a transfer of $100,000 on August 24, 2009.

72.     After these last transfers from the Debtors were made, Robert Stein and Attorney Santangelo finally confronted Goldberg with his lies but were only willing to do so in a public place with security cameras and armed guards.

73.     Upon information and belief, neither Robert Stein nor any of the Stein-related entities received any further transfers from the Debtors following this meeting.

**The Stein, L.P. Transfers**

74.     All transfers made by the Debtors to Stein, L.P. took place within the two-year period prior to the Petition Date (the "Stein, L.P. Two-Year Transfers").  These transfers total $1,175,000.00 and are set forth, by date and amount, in attached **Schedule A**.

75.     As a result of Robert Stein's close and multifaceted investment relationship with the Debtors, Robert Stein and Goldberg, upon information and belief, agreed to effect a capital reduction in October 2008 whereby certain capital invested with the Debtor by Stein, L.P. was not returned to Stein, L.P., but was instead removed

from Stein, L.P.'s capital balance with the Debtors and applied (as if newly invested by certain Stein, L.P. limited partners) in one or more of the AUG LLCs deals.

76.     Upon information and belief, this capital reduction (hereinafter, the "October 2008 Capital Reduction") was effected for certain Stein, L.P. limited partners who wished to achieve the effect of reducing their capital balances at Stein, L.P. to zero in order to use those funds to participate in separate AUG LLCs deals.

77.      In connection with his Rule 2004 examination, Robert Stein produced a type-written list, dated November 3, 2008, of the limited partners of Stein, L.P.  Next to the names "Gayle Brown," "Peter Carbone," "Robert Klein" and "Jay Marmer," the phrase "transferred to AUG" was written by hand.

78.     Consistent with this notation, these four individuals each had subsequent capital contribution amounts in connection with an October 2008 Chase Asset Deal involving AUG II LLC that corresponded precisely with their former capital balances at Stein, L.P.

79.     The  dates and amounts involved in the October 2008 Capital Reduction, by Stein, L.P. limited partners, are set forth in attached **Schedule B.**

80.     Because Stein, L.P. invested with the Debtors as a limited partnership, this reduction of Stein, L.P. capital with the Debtors could only take place at the direction and with the consent of Stein, L.P. and its General Partner, Robert Stein.

81.   After October 2008, Gayle Brown, Peter Carbone, Robert Klein and Jay Marmer had no further capital balances with, and made no further capital contributions to, the Stein, L.P.

82.   Though no money actually changed hands, the Debtors credited the amounts involved in the October 2008 Capital Reduction as new investment and paid out returns based on those amounts in subsequent and separate AUG LLC deals.

83.   In light of the manner in which the Debtors and Robert Stein treated the October 2008 Capital Reduction, it must be subtracted from the total amount of Stein, L.P.'s investment with the Debtors to reach an accurate calculation of the Stein, L.P.'s "profit."[7]

84.   The dates and amounts of the total investment made by Stein, L.P. with the Debtors, as adjusted in light of the October 2008 Capital Reduction, and the dates and amounts of the Stein, L.P. Two-Year Transfers are set forth on attached **Schedule C**.  As demonstrated thereon, the total "profit" transferred by the Debtors to Stein, L.P. was $597,600.

---

[7]  Ignoring the real import of the reduction of certain limited partner capital balances at Stein, L.P. as a result of the application of those balances to future and separate AUG LLCs deals, could inequitably result in efforts by certain defendants to "double-count" the same capital in connection with distinct investments in order to reduce the amount of fictitious "profits" and/or fraudulent transfers for which they are responsible.  For the reasons set forth in **Schedules C** and **E**, however, the $20,000 initially invested by Gayle Brown in Stein, L.P. has not been included in calculation of Stein, L.P. capital with the Debtors or the calculation of its profit.

85.    Almost all of the partners in Stein, L.P. made a "profit" as a result of their investments in Stein, L.P.  The capital contributions, distributions and profits of Stein, L.P. partners are set forth in attached **Schedules D-P.**

### Additional Direct Investments

#### Robert Stein

86.    In addition to investing through Stein, L.P., Robert Stein and his revocable trust also directly invested in the Goldberg Scheme.  Stein, however, ceased personal, direct investment in the Goldberg Scheme in December 2008.

87.    During the two-year period prior to the Petition Date, Robert Stein, in his individual capacity and as trustee for the Robert Stein 1992 Revocable Trust, received no less than $321,213.05 in direct payments from the Debtors (hereinafter the "Robert Stein Two-Year Transfers"), including a preferential payment of $100,000.00 on August 24, 2009.  These transfers, by date and amount, are set forth in attached **Schedule Q**.

88.    During the four-year period prior to the Petition Date, Robert Stein, in his individual capacity and as trustee for the Robert Stein 1992 Revocable Trust, received no less than $375,413.05 in direct payments from the Debtors (hereinafter the "Robert Stein Four-Year Transfers").  These transfers, by date and amount, are set forth in attached **Schedule R**.

#### Michael Stein

89.    Michael Stein also directly invested in the Goldberg Scheme.

90.     During the two-year period prior to the Petition Date, Michael Stein received no less than $24,000 in direct transfers from the Debtors (hereinafter the "Michael Stein Two-Year Transfers").   These transfers, by date and amount, are set forth in attached **Schedule S**.

91.     During the four-year period prior to the Petition Date, Michael Stein received no less than $31,800 in direct transfers from the Debtors (hereinafter the "Michael Stein Four-Year Transfers").   These transfers, by date and amount, are set forth in attached **Schedule T**.

### Jeffrey Stein

92.     Jeffrey Stein also directly invested in the Goldberg Scheme.

93.     During the two-year period prior to the Petition Date, Jeffrey Stein received no less than $43,200 in direct transfers from the Debtors (hereinafter the "Jeffrey Stein Two-Year Transfers").  These transfers, by date and amount, are set forth in attached **Schedule U**.

### Barry Gorsun

94.     Barry Gorsun also directly invested in the Goldberg Scheme.

95.     During the two-year period prior to the Petition Date, Barry Gorsun received no less than $268,000 in direct transfers from the Debtors (hereinafter the "Gorsun Two-Year Transfers").   These transfers, by date and amount, are set forth in attached **Schedule V**.

**Gary Slayton**

96.     Gary Slayton also directly invested in the Goldberg Scheme.

97.     During the two-year period prior to the Petition Date, Gary Slayton received no less than $18,600 in direct transfers from the Debtors (hereinafter the "Gary Slayton Two-Year Transfers").   These transfers, by date and amount, are set forth in attached **Schedule W**.

98.     During the four-year period prior to the Petition Date, Gary Slayton received no less than $26,400 in direct transfers from the Debtors (hereinafter the "Gary Slayton Four-Year Transfers").   These transfers, by date and amount, are set forth in attached **Schedule X**.

**Lewis Slayton**

99.     Lewis Slayton also directly invested in the Goldberg Scheme.

100.     During the two-year period prior to the Petition Date, Lewis Slayton received no less than $34,800 in direct transfers from the Debtors (hereinafter the "Lewis Slayton Two-Year Transfers").   These transfers, by date and amount, are set forth in attached **Schedule Y**.

101.     During the four-year period prior to the Petition Date, Lewis Slayton received no less than $43,800 in direct transfers from the Debtors (hereinafter the "Lewis Slayton Four-Year Transfers").   These transfers, by date and amount, are set forth in attached **Schedule Z**.

**First Claim for Relief**
**(Preferential Transfer Against Robert Stein)**
**11 U.S.C. §§ 547, 550(a), 550(c) and 551**

102.    Paragraphs 1-101 of this Complaint are repeated and re-alleged as if fully set forth herein.

103.    On August 24, 2009, the defendant Robert Stein received a transfer from the Debtors in the amount of $100,000.00 ("the Robert Stein Preferential Transfer").

104.    The Robert Stein Preferential Transfer was made on or within 90 days of the Petition Date.

105.    The Robert Stein Preferential Transfer constituted a transfer of the Debtors' interest in property.

106.    The Robert Stein Preferential Transfer was for or on account of an antecedent debt owed to or for the benefit of Robert Stein.

107.    The Debtors made the Robert Stein Preferential Transfer while insolvent.

108.    The Robert Stein Preferential Transfer enabled the defendant Robert Stein to receive more than he would have received if (a) the Debtors' cases were cases under Chapter 7 of the Bankruptcy Code, (b) the Robert Stein Preferential Transfer had not been made, and (c) Robert Stein had received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

109.    As set forth above, Robert Stein did not receive the Robert Stein Preferential Transfer in good faith for value and without knowledge of the avoidability of such transfer.

110.    The Trustee is entitled pursuant to Bankruptcy Code § 547 to avoid the Robert Stein Preferential Transfer and, pursuant to Bankruptcy Code §§ 550(a) and 551, to recover from the defendant Robert Stein, for the benefit of the estate, the property transferred or the value of such property, plus interest.

**<u>Second Claim for Relief</u>**
**(Bankruptcy Code Intentional Fraudulent Transfers Against Stein, L.P.,**
**Robert Stein and the Stein Limited Partner Defendants)**
**11 U.S.C. §§ 548(a)(1)(A), 550(a) and 551**

111.    Paragraphs 1-110 of this Complaint are repeated and re-alleged as if fully set forth herein.

112.    Between December 27, 2007 and August 17, 2009, the Debtors made the Stein, L.P. Two-Year Transfers set forth on **Schedule A**.

113.    The Stein, L.P. Two-Year Transfers were made by the Debtors with the actual intent to hinder, delay and defraud the Debtor's creditors.

114.    The Stein, L.P. Two-Year Transfers constitute transfers of the Debtor's interest in property.

115.    Stein, L.P. received the Stein, L.P. Two-Year Transfers as an initial transferee and made distributions, as set forth on **Schedules D through P,** to Robert Stein and the Stein Limited Partner Defendants as subsequent transferees.

116.    As General Partner of Stein, L.P., Robert Stein is liable not only for Stein, L.P. distributions made to him but for the total amount of the Stein, L.P. Two-Year Transfers made to Stein, L.P.  The Stein Limited Partner Defendants are each liable to the extent of the subsequent transfers actually made to them, or on their behalf.

117.    As set forth above, Stein, L.P., Robert Stein and the Stein Limited Partner Defendants did not receive the Stein, L.P. Two-Year Transfers, or subsequent transfers thereof, for value, in good faith and without knowledge of the avoidability of such transfers.

118.    The Trustee is entitled pursuant to Bankruptcy Code § 548(a)(1)(A) to avoid the Stein, L.P. Two-Year Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551,  to recover from Stein, L.P., Robert Stein, as its General Partner, and the Stein Limited Partner Defendants, for the benefit of the estate, the property transferred, or the value of such property, plus interest, because the Stein, L.P. Two-Year Transfers were made by the Debtor to the Stein, L.P. as an initial transferee and then transferred to Robert Stein and the Stein Limited Partner Defendants as subsequent transferees, none of whom took for value and in good faith.

**<u>Third Claim for Relief</u>**
**(Bankruptcy Code Intentional Fraudulent Transfers Against Robert Stein)**
**11 U.S.C. §§ 548(a)(1)(A), 550(a) and 551**

119.    Paragraphs 1-118 of this Complaint are repeated and re-alleged as if fully set forth herein.

120.    Between January 28, 2008 and August 24, 2009, the Debtors made the Robert Stein Two-Year Transfers set forth on **Schedule Q**.

121.    The Robert Stein Two-Year Transfers were made by the Debtors with the actual intent to hinder, delay and defraud the Debtors' creditors.

122.    The Robert Stein Two-Year Transfers constitute transfers of the Debtors' interest in property.

123.    As set forth above, Robert Stein did not receive the Robert Stein Two-Year Transfers for value, in good faith and without knowledge of the avoidability of such transfers.

124.    The Trustee is entitled pursuant to Bankruptcy Code § 548(a)(1)(A) to avoid the Robert Stein Two-Year Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551, to recover from Robert Stein, for the benefit of the estate, the property transferred, or the value of such property, plus interest.

### Fourth Claim for Relief
**(Bankruptcy Code Intentional Fraudulent Transfers Against Michael Stein)**
**11 U.S.C. §§ 548(a)(1)(A), 550(a) and 551**

125.    Paragraphs 1-124 of this Complaint are repeated and re-alleged as if fully set forth herein.

126.    Between February 1, 2008 and November 12, 2008, the Debtors made the Michael Stein Two-Year Transfers set forth on **Schedule S**.

127.    The Michael Stein Two-Year Transfers were made by the Debtors with the actual intent to hinder, delay and defraud the Debtors' creditors.

128.    The Michael Stein Two-Year Transfers constitute transfers of the Debtors' interest in property.

129.    Michael Stein did not receive the Michael Stein Two-Year Transfers for value, in good faith and without knowledge of the avoidability of such transfers.

130.    The Trustee is entitled pursuant to Bankruptcy Code § 548(a)(1)(A) to avoid the Michael Stein Two-Year Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551, to recover from Michael Stein, for the benefit of the estate, the property transferred, or the value of such property, plus interest.

### Fifth Claim for Relief
**(Bankruptcy Code Intentional Fraudulent Transfers Against Jeffrey Stein)**
**11 U.S.C. §§ 548(a)(1)(A), 550(a) and 551**

131.    Paragraphs 1-130 of this Complaint are repeated and re-alleged as if fully set forth herein.

132.    Between February 1, 2008 and November 18, 2008, the Debtors made the Jeffrey Stein Two-Year Transfers set forth on **Schedule U**.

133.    The Jeffrey Stein Two-Year Transfers were made by the Debtors with the actual intent to hinder, delay and defraud the Debtors' creditors.

134.    The Jeffrey Stein Two-Year Transfers constitute transfers of the Debtors' interest in property.

135.    Jeffrey Stein did not receive the Jeffrey Stein Two-Year Transfers for value, in good faith and without knowledge of the avoidability of such transfers.

136.    The Trustee is entitled pursuant to Bankruptcy Code § 548(a)(1)(A) to avoid the Jeffrey Stein Two-Year Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551, to recover from Jeffrey Stein, for the benefit of the estate, the property transferred, or the value of such property, plus interest.

## Sixth Claim for Relief
### (Bankruptcy Code Intentional Fraudulent Transfers Against Barry Gorsun)
### 11 U.S.C. §§ 548(a)(1)(A), 550(a) and 551

137.    Paragraphs 1-136 of this Complaint are repeated and re-alleged as if fully set forth herein.

138.    Between September 2, 2008 and November 14, 2008, the Debtors made the Gorsun Two-Year Transfers set forth on **Schedule V**.

139.    The Gorsun Two-Year Transfers were made by the Debtors with the actual intent to hinder, delay and defraud the Debtors' creditors.

140.    The Gorsun Two-Year Transfers constitute transfers of the Debtors' interest in property.

141.    Gorsun did not receive the Gorsun Two-Year Transfers for value, in good faith and without knowledge of the avoidability of such transfers.

142.    The Trustee is entitled pursuant to Bankruptcy Code § 548(a)(1)(A) to avoid the Gorsun Two-Year Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551, to

recover from Gorsun, for the benefit of the estate, the property transferred, or the value of such property, plus interest.

### Seventh Claim for Relief
**(Bankruptcy Code Intentional Fraudulent Transfers Against Gary Slayton)**
**11 U.S.C. §§ 548(a)(1)(A), 550(a) and 551**

143.    Paragraphs 1-142 of this Complaint are repeated and re-alleged as if fully set forth herein.

144.    Between February 1, 2008 and November 18, 2008, the Debtors made the Gary Slayton Two-Year Transfers set forth on **Schedule W**.

145.    The Gary Slayton Two-Year Transfers were made by the Debtors with the actual intent to hinder, delay and defraud the Debtors' creditors.

146.    The Gary Slayton Two-Year Transfers constitute transfers of the Debtors' interest in property.

147.    Gary Slayton did not receive the Gary Slayton Two-Year Transfers for value, in good faith and without knowledge of the avoidability of such transfers.

148.    The Trustee is entitled pursuant to Bankruptcy Code § 548(a)(1)(A) to avoid the Gary Slayton Two-Year Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551, to recover from Gary Slayton, for the benefit of the estate, the property transferred, or the value of such property, plus interest.

## Eighth Claim for Relief
**(Bankruptcy Code Intentional Fraudulent Transfers Against Lewis Slayton)**
**11 U.S.C. §§ 548(a)(1)(A), 550(a) and 551**

149.    Paragraphs 1-148 of this Complaint are repeated and re-alleged as if fully set forth herein.

150.    Between February 1, 2008 and November 10, 2008, the Debtors made the Lewis Slayton Two-Year Transfers set forth on **Schedule Y**.

151.    The Lewis Slayton Two-Year Transfers were made by the Debtors with the actual intent to hinder, delay and defraud the Debtors' creditors.

152.    The Lewis Slayton Two-Year Transfers constitute transfers of the Debtors' interest in property.

153.    Lewis Slayton did not receive the Lewis Slayton Two-Year Transfers for value, in good faith and without knowledge of the avoidability of such transfers.

154.    The Trustee is entitled pursuant to Bankruptcy Code § 548(a)(1)(A) to avoid the Lewis Slayton Two-Year Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551, to recover from Lewis Slayton, for the benefit of the estate, the property transferred, or the value of such property, plus interest.

<u>Ninth Claim for Relief</u>
**(CUFTA Intentional Fraudulent Transfer Against Stein, L.P.,
Robert Stein And The Stein Limited Partner Defendants)
11 U.S.C. §§ 544 (b)(1), 550(a) and 551 and
Conn. Gen. Stat. § 52-552e(a)(1), and § 52-552h(a)**

155.    Paragraphs 1-154 of this Complaint are repeated and re-alleged as if fully set forth herein.

156.    Between December 27, 2007 and August 17, 2009, the Stein, L.P. Two-Year Transfers were made by the Debtors with the actual intent to hinder, delay or defraud the Debtors' creditors.

157.    The Stein, L.P. Two-Year Transfers constituted fraudulent transfers within the meaning of, and in violation of Conn. Gen. Stat. § 52-552e(a)(1).

158.    At all times relevant to the Stein, L.P. Two-Year Transfers, there have been creditors who have held and still hold matured or unmatured unsecured claims against the Debtors that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

159.    The Trustee is entitled pursuant to Bankruptcy Code §544(b)(1) and  Conn. Gen. Stat. § 52-552e(a)(1) to avoid the Stein, L.P. Two Year Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551 and Conn. Gen. Stat. 52-552h(a),  to recover from Stein, L.P., Robert Stein, as its General Partner, and the Stein Limited Partner Defendants, for the benefit of the estate, the property transferred or the value of such property, plus interest because the Stein, L.P. Two-Year Transfers were made by the Debtors to Stein,

36

L.P. as an initial transferee and then transferred to Robert Stein and the Stein Limited

Partner Defendants as subsequent transferees, none of whom took for value, in good faith

and without knowledge of the avoidability of the transfers.

**Tenth Claim for Relief**
**(CUFTA Intentional Fraudulent Transfer Against Robert Stein)**
**11 U.S.C. §§ 544 (b)(1), 550(a) and 551 and Conn. Gen. Stat. § 52-552e(a)(1), and §**
**52-552h(a)**

160.    Paragraphs 1-101 and 120-124 of this Complaint are repeated and re-

alleged as if fully set forth herein.

161.    Between January 22, 2007 and August 24, 2009, the Debtors made the

Robert Stein Four-Year Transfers set forth on **Schedule R**

162.    The Robert Stein Four-Year Transfers were made by the Debtors with the

actual intent to hinder, delay or defraud the Debtors' creditors.

163.    The Robert Stein Four-Year Transfers constituted fraudulent transfers

within the meaning of, and in violation of Conn. Gen. Stat. § 52-552e(a)(1).

164.    At all times relevant to the Robert Stein Four-Year Transfers, there have

been creditors who have held and still hold matured or unmatured unsecured claims

against the Debtors that were and are allowable under section 502 of the Bankruptcy

Code or that were and are not allowable only under section 502(e).

165.    The Trustee is entitled pursuant to Bankruptcy Code §544(b)(1) and Conn.

Gen. Stat. § 52-552e(a)(1) to avoid the Robert Stein Four-Year Transfers and, pursuant to

Bankruptcy Code §§ 550(a) and 551 and Conn. Gen. Stat. 52-552h(a), to recover from

Robert Stein, for the benefit of the estate, the property transferred or the value of such

property, plus interest because the Robert Stein Four-Year Transfers were made by the

Debtors to Robert Stein, who did not take for value, in good faith or without knowledge

of the avoidability of the transfers.

### Eleventh Claim for Relief
**(CUFTA Intentional Fraudulent Transfer Against Michael Stein)**
**11 U.S.C. §§ 544 (b)(1), 550(a) and 551 and Conn. Gen. Stat.**
**§ 52-552e(a)(1), and § 52-552h(a)**

166.     Paragraphs 1-101 and 126-130 of this Complaint are repeated and re-

alleged as if fully set forth herein.

167.     Between April 18, 2007 and December 18, 2008, the Debtors made the

Michael Stein Four-Year Transfers set forth on **Schedule T**.

168.     The Michael Stein Four-Year Transfers were made by the Debtors with

the actual intent to hinder, delay or defraud the Debtors' creditors.

169.     The Michael Stein Four-Year Transfers constituted fraudulent transfers

within the meaning of, and in violation of Conn. Gen. Stat. § 52-552e(a)(1).

170.     At all times relevant to the Michael Stein Four-Year Transfers, there have

been creditors who have held and still hold matured or unmatured unsecured claims

against the Debtors that were and are allowable under section 502 of the Bankruptcy

Code or that were and are not allowable only under section 502(e).

171.    The Trustee is entitled pursuant to Bankruptcy Code §544(b)(1) and Conn.

Gen. Stat. § 52-552e(a)(1) to avoid the Michael Stein Four-Year Transfers and, pursuant to

Bankruptcy Code §§ 550(a) and 551 and Conn. Gen. Stat. 52-552h(a), to recover from

Michael Stein, for the benefit of the estate, the property transferred or the value of such

property, plus interest because the Michael Stein Four-Year Transfers were made by the

Debtors to Michael Stein, who did not take for value, in good faith and without

knowledge of the avoidability of the transfers.

### Twelfth Claim for Relief
**(CUFTA Intentional Fraudulent Transfer Against Gary Slayton)**
**11 U.S.C. §§ 544 (b)(1), 550(a) and 551 and Conn. Gen. Stat.**
**§ 52-552e(a)(1), and § 52-552h(a)**

172.    Paragraphs 1-101 and 144-148 of this Complaint are repeated and re-

alleged as if fully set forth herein.

173.    Between April 18, 2007 and November 18, 2008, the Debtors made the

Gary Slayton Four-Year Transfers set forth on **Schedule X.**

174.    The Gary Slayton Four-Year Transfers were made by the Debtors with the

actual intent to hinder, delay or defraud the Debtors' creditors.

175.    The Gary Slayton Four-Year Transfers constituted fraudulent transfers

within the meaning of, and in violation of Conn. Gen. Stat. § 52-552e(a)(1).

176.    At all times relevant to the Gary Slayton Four-Year Transfers, there have

been creditors who have held and still hold matured or unmatured unsecured claims

against the Debtors that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

177.    The Trustee is entitled pursuant to Bankruptcy Code §544(b)(1) and Conn. Gen. Stat. § 52-552e(a)(1) to avoid the Gary Slayton Four-Year Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551 and Conn. Gen. Stat. 52-552h(a), to recover from Gary Slayton, for the benefit of the estate, the property transferred or the value of such property, plus interest because the Gary Slayton Four-Year Transfers were made by the Debtors to Gary Slayton, who did not take for value, in good faith and without knowledge of the avoidability of the transfers.

### Thirteenth Claim for Relief
**(CUFTA Intentional Fraudulent Transfer Against Lewis Slayton)**
**11 U.S.C. §§ 544 (b)(1), 550(a) and 551 and Conn. Gen. Stat.**
**§ 52-552e(a)(1), and § 52-552h(a)**

178.    Paragraphs 1-101 and 150-154 of this Complaint are repeated and re-alleged as if fully set forth herein.

179.    Between April 18, 2007 and November 10, 2008, the Debtors made the Lewis Slayton Four-Year Transfers set forth on **Schedule Z.**

180.    The Lewis Slayton Four-Year Transfers were made by the Debtors with the actual intent to hinder, delay or defraud the Debtors' creditors.

181.    The Lewis Slayton Four-Year Transfers constituted fraudulent transfers within the meaning of, and in violation of Conn. Gen. Stat. § 52-552e(a)(1).

182.    At all times relevant to the Lewis Slayton Four-Year Transfers, there have been creditors who have held and still hold matured or unmatured unsecured claims against the Debtors that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

183.    The Trustee is entitled pursuant  to Bankruptcy Code §544(b)(1) and Conn. Gen. Stat. § 52-552e(a)(1) to avoid the Lewis Slayton Four-Year Transfers and, pursuant to Bankruptcy Code §§ 550(a) and 551 and Conn. Gen. Stat. 52-552h(a), to recover from Lewis Slayton, for the benefit of the estate, the property transferred or the value of such property, plus interest because the Lewis Slayton Four-Year Transfers were made by the Debtors to Lewis Slayton, who did not take for value, in good faith and without knowledge of the avoidability of the transfers.

For the reasons set forth above, the plaintiff seeks:

(a)      Damages;

(b)      Avoidance of the transfers as set forth above;

(c)      A Judgment directing that the transfers set forth above be set aside and recovered for the benefit of the estates;

(d)      A permanent injunction against all defendants from transferring or disposing from any assets during the pendency of this bankruptcy case;

(e)      Attorney's fees;

(f)      Prejudgment interest;

(g)      Costs;

(h)      The appointment of a receiver for the Stein, L.P.; and

(i)      Such other and further relief as the Court deems just and proper.

Dated at Bridgeport, Connecticut this 25th day of August, 2011.

JAMES BERMAN, CHAPTER 7 TRUSTEE
FOR THE ESTATES OF
MICHAEL S. GOLDBERG AND
MICHAEL S. GOLDBERG, LLC

By    /s/ Thomas J. Seigel
       Jeffrey Hellman (ct04102)
       Jed Horwitt (ct04778)
       Thomas J. Seigel (ct27807)
       ZEISLER & ZEISLER, P.C.
       558 Clinton Avenue
       Bridgeport, Connecticut 06605
       (203) 368-4234
       (203) 367-9678 (fax)
       jhellman@zeislaw.com